**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>                              Plaintiff,  )<br>vs.                           )<br>                              )<br>CHARLES EDWARD COOPER, JR.,  )<br>                              Defendant.  )<br>_____ ) | Case No. 2:14-cr-00228-JAD-CWH<br><br>**REPORT AND RECOMMENDATION** |

This matter is before the Court on Defendant Charles Edward Cooper's ("Cooper") Motion to Suppress Evidence for Fourth Amendment Violations (#28), filed on November 4, 2014. The Court also considered the Government's Response (#31), filed on December 1, 2014, and Cooper's Reply (#34), filed on December 8, 2014. The court conducted an evidentiary hearing on January 29, 2015.

**I. FACTUAL BACKGROUND**

On May 31, 2014, at approximately 8:30 p.m., Michelle Basolo ("Ms. Basolo") and her boyfriend, Cooper, got into an argument at their shared home. Ms. Basolo was injured, and she and her 16-year-old daughter drove to a local hospital for treatment. At about 10:30 p.m., Las Vegas Metropolitan Police Department ("Metro") Officers Brumaghin and Ralyea arrived at the local hospital and met with Ms. Basolo and her daughter. Both Ms. Basolo and her daughter were interviewed at the same time and place, and the daughter assisted her mother in writing a statement about the incident because Ms. Basolo was injured and unable to write. *See* Gov't Ex. 18. Officer Brumaghin testified that Ms. Basolo said her injuries were caused by her boyfriend,[1] that her boyfriend was asleep in the backyard of their home, and that there was a black shotgun in the bedroom. Ms. Basolo's daughter confirmed that the assault had occurred, and also indicated that Cooper had a firearm in his vehicle,

---

[1] She reportedly said, "my boyfriend beat my ass."

1  a Jaguar. Officer Brumaghin testified that he was informed through a CAD report displayed in his
2  patrol car, which resulted from the 911 call, that there was a firearm at the residence. The CAD report
3  indicated, among other things, that Cooper is the suspect, that he is a prior felon, and there is a shotgun
4  in the residence. *See* Gov't Ex. 19. Similarly, Officer Ralyea testified that Ms. Basolo said Cooper
5  had strangled her, and he observed broken blood vessels in her eyes and injuries to her wrist, with the
6  latter causing her inability to write a statement. He also testified that Ms. Basolo said there was a
7  shotgun in the house. Based upon his discussion with Ms. Basolo and her daughter, Officer
8  Brumaghin told Ms. Basolo that he would go to the residence and make contact with Cooper, which
9  she acknowledged. He testified that probable cause existed to believe that Cooper had committed
10 domestic violence by strangulation. The officers left the hospital at about 11:15 p.m.

11 At about 11:30 p.m., while Ms. Basolo was still at the hospital, Officers Brumaghin and
12 Ralyea, and two other officers arrived at the home. The home is a single-family home with a backyard
13 that is completely surrounded by a block wall. Officer Brumaghin testified that he was concerned
14 about officer safety because he believed that Ms. Basolo had been the victim of violence, and there was
15 a firearm at the house. According to Officer Brumaghin, in order to maintain stealth to ensure officer
16 safety, the officers made no attempt to knock on the front door or announce their presence. Officer
17 Brumaghin conceded on cross examination that no consent to enter the residence had been obtained
18 from anyone.

19 Upon arrival, one officer took a position at the rear of the house, looked over the wall into the
20 backyard, and verified that someone was sleeping on the back patio. Officer Brumaghin went to the
21 side of the home and encountered a latched gate, which he was unable to open. He jumped over the
22 wall and unlatched the gate from the inside, allowing the other officers to enter the backyard.

23 The officers found Cooper asleep on the back patio and, without incident, placed him under
24 arrest at about 12 a.m. Cooper was handcuffed and moved to a patrol car across the street in the front
25 of the house. When Officer Brumaghin asked Cooper what happened, Cooper said words to the effect
26 that he had gotten into an argument with Ms. Basolo, and that Ms. Basolo had another boyfriend.
27 Cooper was not advised of his *Miranda* rights.

28 While the officers were questioning Cooper, Ms. Basolo returned to the home. Officer

Brumaghin testified that when Ms. Basolo arrived back at the home and saw Cooper, her demeanor changed and she indicated that nothing had happened and that Cooper was "her paycheck" and she did not want to press charges.

Because the incident involved a felon potentially being in possession of a firearm, Detective Rinetti from Metro's Firearm Investigation Unit was summoned to the residence. When he arrived, Detective Rinetti was informed that the officers believed a firearm was in the residence, and that Cooper had a prior felony conviction. Detective Rinetti attempted to discuss the incident with Ms. Basolo, but she was uncooperative and so he asked his supervisor, Detective Sergeant Wolfenberger, to speak with her. Detective Sergeant Wolfenberger testified that he then spoke with Ms. Basolo, along with her daughter, and that each of them indicated that there was a shotgun and two pistols in the house. Ms. Basolo also indicated that she did not want to cooperate because Cooper was "her paycheck."[2]

Detective Bien, another firearms detective, arrived at the scene at about 1:30 a.m. and interviewed Cooper in the patrol car located across the street from the home. There were three other patrol cars within sight of the patrol car in which Cooper was sitting. He testified that, after administering *Miranda* warnings, Cooper made various incriminating statements –those which Cooper now desires to suppress–regarding the firearms in the home. The interrogation was recorded. Detective Bien was not aware of whether Cooper had been asked any questions prior to his arrival.

At about 3:15 a.m., based upon the information he received from Detective Sergeant Wolfenberger and Officer Ralyea, Detective Rinetti telephonically applied for, and received, a search warrant for the residence. The relevant portion of the transcribed affidavit in support of the search warrant is set forth below:

> Prior to the officers leaving the hospital to attempt to locate Cooper, they questioned Basolo if there was any firearms in the home he had access to, to which she stated there was a black pump action shotgun in the couple's bedroom underneath the bed that she had purchased two years ago. Upon officers arriving, they located Cooper in the backyard sleeping where they took him into custody at 2358 hours without incident. Charles Cooper, ID #604892 has 47 prior arrests with multiple felony convictions. Such convictions are Robber[y] with a Deadly Weapon in 1983, Burglary Deadly Weapon 1983,

---

[2] Detective Wolfenberger also testified that the daughter said that she had seen a gun in Cooper's Jaguar vehicle.

Possession of a Controlled Substance for Sales in 1998, Attempt Possession of Controlled Substance for Sales in 1998. During a taped interview conducted by Detect – by Detective Frank Bien, P# 7946, Cooper admitted to having touched and manipulating the shotgun on multiple occasions. In having been explained, the DNA process stated to Detective Bien his DNA would be found on the shotgun.

Officers executed the search warrant and recovered three firearms from inside the residence early in the morning of June 1, 2014. On July 1, 2014, Cooper was indicted with one count of Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (#1). Cooper moves to suppress those firearms and his statement to Detective Bien.

## II. ANALYSIS

Cooper seeks suppression of his statements based on Metro's illegal in-home arrest, arguing that his post arrest statements are tainted and therefore must be suppressed. Cooper also argues that the search warrant application must be redacted to remove Cooper's statements, as the taint extends to their derivative use.

Additionally, Cooper argues that the statements allegedly obtained from Ms. Basolo at the hospital and later at the residence, which are contained in the affidavit in support of the warrant, are material misrepresentations and must be excised from the warrant affidavit under *Franks v. Delaware*, 438 U.S. 154 (1978). The court will first address the legality of the warrantless arrest in Cooper's backyard.

### A. Consent

The government argued that the officers had consent and apparent authority to enter the home because they told Ms. Basolo that they were going to the home to contact Cooper, and Ms. Basolo acknowledged this. The officers testified, however, that they did not believe they had Ms. Basolo's consent to enter the house. As Cooper has argued in response, mere acquiescence to a claim of lawful authority is insufficient to meet the government's burden to prove that consent was freely and voluntarily given. *Bumper v. North Carolina*, 391 U.S. 543 (1968). Accordingly, the Court finds that the police did not possess consent to enter the home or its curtilage.

### B. Exigent Circumstances

The government argues that exigent circumstances were present which excused the requirement for a warrant to arrest Cooper in his home. The Fourth Amendment addresses "the right of the people

to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. Amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). It protects "people not places." *Id*. Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

It is a "basic principle of Fourth Amendment law" that searches and seizures inside a home without a warrant are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). The presumptive protection accorded people at home extends to outdoor areas traditionally known as "curtilage"–areas that, like the inside of a house, "harbor[ ] the intimate activity associated with the sanctity of a [person's] home and the privacies of life." *United States v. Dunn*, 480 U.S. 294, 300 (1987). Cooper's backyard, a fenced yard adjacent to his home in a residential neighborhood is unquestionably a "curtilage" subject to Fourth Amendment protection. *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010). "It is clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances." *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) (emphasis added).

The exigent circumstances exception is premised on a showing that the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The Ninth Circuit has previously defined those situations as: (1) the need to prevent physical harm to officers or other persons; (2) the need to prevent the imminent destruction of relevant evidence; (3) the hot pursuit of a fleeing suspect; and (4) the need to prevent the escape of a suspect. *See United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010) (citations omitted). The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances. *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002). Because the Fourth Amendment ultimately turns on the reasonableness of the officer's actions in light of the totality of the circumstances, however, there is no immutable list of exigent circumstances; they may include "some other consequence improperly frustrating legitimate law enforcement efforts." *Struckman*, 603 F.3d at 743. Exigent circumstances are "those in which a substantial risk of harm to the persons involved or to the law

enforcement process would arise if the police were to delay a search [or arrest] until a warrant could be obtained." *United States v. Al-Azzawy*, 784 F.2d 890, 894 (9th Cir. 1985) (citation omitted).

The government claims that exigent circumstances existed, which justified the intrusion, but Cooper disagrees. The officers expressed no concern regarding hot pursuit, the possibility that Cooper would flee, or that there was a need to prevent the destruction of evidence. The officers were concerned, however, about the risk of physical harm to themselves because they knew that Cooper had recently brutally attacked his girlfriend, that he had previously been arrested and convicted numerous times of violent crimes, and that he had access to a firearm.

The Court finds that exigent circumstances did not exist. The domestic battery occurred at about 8:30 p.m., but police did not arrive at the home until 11:45 p.m. During this passage of time, there were no reports of any ongoing threats at the home, and no other person was reported to have been there. Both Ms. Basolo and her daughter told the officers that Cooper was asleep in the back yard, so Cooper must have been asleep before they went to the hospital. Once law enforcement officers arrived, Cooper was under their observation, and was still asleep. As such, he was not an immediate threat to anyone. Officers made no effort to obtain a search warrant, although they were able to do so a few hours later, at 3:15 a.m., to conduct the search and seizure of the residence. It is true that Cooper had a violent criminal record, and that he likely had access to a firearm, but there is no indication that Cooper had brandished the firearm or threatened to use it. He had not threatened any violence to any other person, and he was not in an agitated state. The Court recognizes that a knock on the door by police raises the possibility that Cooper would run into the home, forcing a more dangerous encounter. But it is also possible that he would have cooperated with police and given his explanation of the incident, as he did when he was arrested. The Court finds that there was not a substantial risk of harm to law enforcement or others if the arrest was delayed until a warrant could be obtained. Accordingly, when they entered the curtilage of the home and arrested Cooper, the officers conducted an unreasonable search and seizure under the Fourth Amendment. The Court now addresses the consequences of this unreasonable search and seizure.

### C. Cooper's Statement to Detective Bien

At about 1:30 a.m., Detective Bien arrived on the scene, received a brief regarding the

investigation, and then conducted a tape recorded interrogation of Cooper in the patrol car located in front of the home. Cooper argues that because his arrest in his home was illegal, the statement made to police must be suppressed as "fruit" of that illegal arrest. The government argues that when there is probable cause for the arrest, the illegal arrest does not automatically require the exclusion of subsequent statements made outside the premises.

The U.S. Supreme Court, in *New York v. Harris*, held that when the police have probable cause to arrest a suspect, the exclusionary rule does not bar the government's use of a statement made by the defendant outside of his home, even if the statement is taken after an illegal arrest. 495 U.S. 14, 18 (U.S. 1990). In *Harris*, the police illegally entered the defendant's home and arrested him based on probable cause that he had recently committed murder. *Id*. at 15-17. Later, at the police station, the defendant waived his *Miranda* rights and provided a statement. *Id*. at 16. Over the defendant's objection, the trial court allowed this statement to come into evidence. *See id.* The Supreme Court upheld the trial court's ruling.[3] *Id.; see also United States v. Crawford*, 372 F.3d 1048, 1055 (9th Cir. 2004) (same).

The application of *Harris* first requires a determination of whether the arrest was supported by probable cause. "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted). Officers Brumaghin and Ralyea were dispatched to the hospital emergency room in response to a 911 emergency call, which reported domestic violence. They spoke with Ms. Basolo and her daughter at the hospital regarding the incident, which occurred at her home. Both Ms. Basolo and her daughter said that Cooper had struck and strangled her. Both officers saw the injuries to her wrist and eyes, which they believed corroborated her claims. The Court finds that there was probable cause to arrest Cooper for the battery by strangulation of Ms. Basolo.

Because the officers had probable cause to arrest Cooper, he was not unlawfully in custody when he was removed from the backyard of the home to the patrol car located across the street from

---

[3] On the other hand, a statement made subsequent to an illegal arrest without probable cause would be suppressed because it would be the product of the unlawful custody. *See Harris*, 495 U.S. at 18.

1    the home. Although Cooper points out that he was only across the street at the time he was
2    interrogated, he was no longer <u>within</u> his home. The officers therefore did not exploit the illegal entry
3    by attempting to conduct the interrogation in the home. *Harris*, 495 U.S. at 20. Accordingly, *Harris*
4    controls the outcome of this issue: although Cooper was arrested in his home in violation of the Fourth
5    Amendment, his subsequent statement to Detective Bien is not tainted by that illegality because it was
6    taken outside of his home.[4]

### D. The Allegation of False Statements in the Search Warrant Affidavit

Officer Rinetti applied for and received a search warrant to search the home at about 3:15 a.m. Cooper argues that Officer Rinetti recklessly misrepresented two of Ms. Basolo's statements to the judge who issued the search warrant, and that he is entitled to an evidentiary hearing regarding the truthfulness of those statements.

As a general matter, a defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that: (1) the affidavit contains intentionally or recklessly false statements or misleading omissions; and (2) the affidavit cannot support a finding of probable cause without the allegedly false information. *See United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000); *see also Franks v. Delaware*, 438 U.S. 154 (1978); *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985) (holding that a defendant could challenge a facially valid affidavit by making a substantial preliminary showing that the affiant intentionally or recklessly omitted facts required to prevent a technically true statement in the affidavit from being misleading). "To justify a hearing, a defendant must make specific allegations including one of a deliberate falsehood or reckless disregard for the truth and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted). Intentional or reckless omissions may also provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565 (9th Cir. 2007).

If a defendant makes the requisite preliminary showing, a hearing is conducted to determine

---

[4] The government alternatively argued that under the inevitable discovery doctrine, the search warrant would have been valid without Cooper's statement in the affidavit, and if Cooper had not been taken into custody, the subsequently obtained search warrant would have allowed the police to arrest Cooper inside the home during the course of the execution of the search warrant. In view of the finding that Cooper's statement is admissible, not tainted by the arrest, the Court need not analyze these arguments.

the validity of the warrant under *Franks*. Suppression should result if, after excising the false statements from the affidavit, there is no probable cause for the warrant. *See Franks*, 438 U.S. at 171-172; *see also United States v. Kyllo*, 37 F.3d 526, 529-30 (9th Cir. 1994) (holding *Franks* hearing was required when material facts were omitted that substantially undermined probable cause of the search warrant); *United States v. DeLeon*, 979 F. 2d 761, 764 (9th Cir. 1992) (holding a deliberate or reckless omission by a government official who is not the affiant can be the basis for a *Franks* suppression). Generally, clear proof of a deliberate or reckless omission is not required as such proof is reserved for the evidentiary hearing. *United States v. May*, No. 2: 08-CR-00012-PMP-GWF, 2009 WL 1542557, at *9 (D. Nev. May 29, 2009) (citations omitted). "Deliberate intent to deceive or reckless disregard for the truth can be inferred from the omission of materials facts that would have negated probable cause." *Id*. On the other hand, "omissions or misstatements resulting from negligence or good faith mistakes will not invalidate an affidavit which on its face establishes probable cause." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009) (citation omitted).

Here, the evidentiary hearing was conducted to consider both the facts surrounding Cooper's in-home arrest and evidence surrounding the application for the warrant. Cooper alleges that two of Ms. Basolo's statements were recklessly misrepresented in the affidavit for the search warrant. The first statement is as follows:

> Prior to officers leaving the hospital to attempt to locate Cooper, they questioned Basolo if there was any firearms in the home he had access to, to which she stated there was a black pump action shotgun in the couple's bedroom underneath the bed that she purchased two years ago.

Cooper maintains that the statement is false and that Ms. Basolo never informed the officers at the hospital that there was a shotgun in the couple's bedroom. Ms. Basolo did not testify at the hearing.[5] Both Officers Brumaghin and Ralyea testified that when they interviewed Ms. Basolo at the hospital, she told them that there was a black shotgun at the house. During cross-examination, to controvert this evidence, Cooper introduced a Domestic Violence Auxiliary form which was completed by Officer Ralyea. The form, mandatory for domestic violence cases, contains several questions.

---

[5] Ms. Basolo was present during the evidentiary hearing, presumably at the request of the defense. Government counsel expressed concern, with which defense counsel agreed, that if Ms. Basolo testified, she might incriminate herself, and so the undersigned magistrate judge appointed an attorney to assist Ms. Basolo. Counsel later reported to the Court that he had discussed the matter with Ms. Basolo. She was not called as a witness.

Number 4 asks "Does he/she [the aggressor] have a gun or can he/she get one easily?"  Def. Ex. D. Officer Ralyea testified that he marked the response "No" because that was Ms. Basolo's response when she met with him at the house, after she had returned from the hospital and had become uncooperative.  He explained that he truthfully completed the form based upon what she told him at that time, even though it was inconsistent with what she had previously told him at the hospital.[6]  Officer Ralyea did not advise Detective Rinetti, who was preparing the search warrant, of the inconsistency in her subsequent statement.

Although Cooper made no argument that this inconsistency had been omitted from the affidavit, the Court will address it.  The affidavit reports Ms. Basolo's statement at the hospital, and is corroborated by the CAD report of the 911 call and Ms. Basolo's daughter's statement.  As written, the statement is not intentionally or recklessly false.  Assuming, *arguendo*, that the omission of the subsequent inconsistent statement reported on the Domestic Violence Auxiliary Form was added back into the affidavit, as required when there is an intentional misleading omission, also added would have been the explanation that Ms. Basolo changed her willingness to cooperate because Cooper was "her paycheck" and therefore she did not want to press charges.  Adding this complete omission to the warrant would not have substantially undermined probable cause for the search warrant.  *See United States v. Kyllo*, 37 F.3d 526, 529-30 (9th Cir. 1994) (holding *Franks* hearing was required when material facts were omitted that substantially undermined probable cause of the search warrant).

Additionally, Cooper introduced the Domestic Violence Report, Exhibit C, which indicates that it was Ms. Basolo's daughter who stated that "her mom keeps a shotgun next to her bed," implying that Ms. Basolo did not make a similar statement.  The Court finds that the testimony of Officers Ralyea and Brumaghin that Ms. Basolo said there was a shotgun in the home is credible and not intentionally false, reckless, or misleading.  At most, any mistake in the documentation of the investigation was simple carelessness, and under these circumstances insufficient to invalidate an affidavit, which on its face establishes probable cause.  *Ewing,* 588 F.3d at 1224.

The second statement which Cooper alleges to have been a material misrepresentation is as

---

[6] On cross examination, in an effort to diminish the credibility of his testimony, Office Ralyea was asked and admitted that in 2009, he received a reprimand for conduct unbecoming an officer and failing to make arrangements to participate in outside employment.  The court finds this testimony is of minimal value in weighing Officer Ralyea's credibility.

follows:

> Furthermore, the victim Michelle Basolo stated to Sgt B Wolfenbarger, P# 5980 that there are at least two more handguns inside the home she has seen with – seen with Cooper that she did not purchase.

Although Cooper maintains that this statement is a material misrepresentation, Sergeant Wolfenbarger testified that when he spoke with Ms. Basolo, she said that there were multiple firearms in the home, and specifically that there was a shotgun and two handguns there. The Court finds that this statement accurately reflects, and is not a material misrepresentation of, Ms. Basolo's statements.

Having failed to establish that the affidavit in support of the search warrant contains intentionally false or misleading statements, the undersigned magistrate judge has no difficulty finding that there was probable cause for the search warrant.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing and good cause appearing therefore, **IT IS HEREBY RECOMMENDED** that Defendant Charles Edward Cooper's Motion to Suppress (#43) be **denied.**

## NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that: (1) failure to file objections within the specified time; and (2) failure to properly address and brief the objectionable issues waives the right to appeal the district court's order and/or appeal factual issues from the order of the district court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED: February 25, 2015

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**