NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar Number 13644
ELIZABETH O. WHITE
Assistant United States Attorney
400 South Virginia Street, Suite 900
Reno, Nevada 89501
775-784-5438
Elizabeth.O.White@usdoj.gov
*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America, | Case No.: 2:14-cr-228-JAD-CWH |
| Plaintiff, | |
| v. | **Government's Response in Opposition to Defendant's "Emergency Motion for Sentence Reduction Pursuant to Title 18 § 3582(c)(1)(A)(i)" [ECF No. 264]** |
| Charles E. Cooper, | |
| Defendant. | |

CERTIFICATION: This response is timely.

## INTRODUCTION

Defendant Charles Cooper moves this Court, pursuant to 18 U.S.C. § 3582(c)(1)(A), to reduce his sentence based on the spread of the coronavirus within the federal prison system and his claimed "at risk health." ECF No. 264. Because Cooper fails to demonstrate that he has satisfied the statutory requirements under § 3582(c)(1)(A), or that extraordinary and compelling reasons support his request for release, this Court should deny his motion.

**FACTS AND PROCEDURAL HISTORY**

**A.    Cooper's Offense Conduct, Conviction, and Sentence**

In May 2014, Cooper got into an argument with his girlfriend, Michelle Basolo, at their shared home. ECF No. 45 (Magistrate Judge's report and recommendation), at 1. Basolo's 16-year-old daughter drove her mother to the hospital for treatment. *Id*. While on the way to the hospital, Basalo's daughter called 911, and told the 911 operator (among other things) that there was a shotgun in the house. *Id*. at 2; TT at 523–524,571–571. This information was relayed to officers on a computer dispatch report, which also noted that Cooper, the suspect in the domestic violence offense, was a previously convicted felon. ECF No. 45, at 2.

Las Vegas Metro Officers Anthony Brumaghin and Charles Ralyea went to the hospital and interviewed Basolo and her daughter, with Basolo's daughter assisting her in writing a statement about the incident because Basolo was injured and unable to write. *Id*. Basolo told officers that "[her] boyfriend beat [her] ass," and had strangled her. *Id*. at 1. Ralyea saw broken blood vessels in Basolo's eyes and injuries to her wrist. ECF No. 45, at 2. Basolo told officers that Cooper was asleep in the backyard of their home, and that there was a shotgun in the bedroom. *Id*. at 1. Basolo's daughter confirmed the battery, and also said Cooper had a firearm in his car. *Ibid*.

Brumaghin, Ralyea, and two other officers went to Cooper's and Basolo's home. *Ibid*. The officers found Cooper asleep on the back patio and arrested him. *Ibid*. Brumaghin asked him what happened, and Cooper said he had gotten into an argument with Basolo, and that Basolo had another boyfriend. *Ibid*.

Detective Lawrence Rinetti from Metro's Firearm Investigation Unit was summoned to the residence. *Ibid*. At about 3:15 a.m., Rinetti applied for, and received, a telephonic search warrant for the house. *Ibid*. Officers executed the search warrant and recovered three firearms from inside the home.

After Cooper was convicted by a jury of unlawful possession of a firearm by a felon, ECF No. 180, the probation office prepared a presentencing investigation report ("PSR"), which found that Cooper qualified as an armed career criminal, calculated an advisory guidelines range of 235–293 months' imprisonment, and recommended a sentence of 235 months. *See* PSR ¶¶ 24, 114, 133. The PSR identified three predicate convictions that qualified as violent felonies for ACCA purposes: two Nevada felony convictions for robbery with use of a deadly weapon, *see* PSR ¶ 29; and a Nevada felony conviction for battery with substantial bodily harm. PSR ¶ 38.

At sentencing, the Court found that Nevada felony robbery with use of a deadly weapon did not qualify as a violent felony. ECF No. 229, at 57. Without the ACCA enhancement, but agreeing with the government that Cooper had at least two prior drug trafficking offenses, the Court calculated an advisory guidelines range of 168–210 months' imprisonment, which was capped by the statutory maximum 120 months for the offense of conviction, *see id*. at 61–62, and sentenced Cooper to 120 months' imprisonment. ECF No. 225. The court of appeals affirmed in all respects. ECF No. 255.

**B.    Cooper's Motion in This Court**

On April 8, 2020, Cooper filed a motion in this Court seeking a sentence reduction. ECF No. 264. He claims that the combination of the "rapid spreading coronavirus within the BOP" and his "at risk health" together constitute "compelling and extraordinary

3

circumstances" that warrant his release. *Id.* at 1. He asks the Court to release him to reside with his ailing mother in Las Vegas. *Id.* at 2. Cooper appears to acknowledge that there are no confirmed COVID-19 cases at the prison which he is housed, but contends that there are currently "at least two confirmed cases of Covid-19 in the town of Safford, AZ," and that it is "only a matter of time before it is introduced into" the prison. *Id.* at 3.

## POINTS AND AUTHORITIES

**Cooper Has Not Established That This Court Has Jurisdiction to Consider His Request, or That Extraordinary and Compelling Reasons Exist to Warrant His Release.**

### A. Statutory Framework and Burdens

A federal district court generally "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 824–25 (2010). Compassionate release is a rare exception to that rule for extraordinary cases.

The compassionate release statute, in pertinent part, authorizes a court to modify a term of imprisonment "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."18 U.S.C. § 3582(c)(1)(A)(i).

A defendant bears the burden of proving both that he has satisfied the procedural prerequisites for judicial review—*i.e.*, that he has "exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [her] behalf" or that 30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and compelling reasons" exist to support the motion. 18 U.S.C. § 3582(c)(1)(A); *see United States*

*v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case."). Cooper has not met either burden.

**B.     Cooper Has Not Satisfied the Statutory Requirements for Filing This Motion.**

Cooper asserts—with no evidence to support his assertion—that he "has requested through electronically written requests to his Unit Team and the Warden at FCI Safford law a compassionate release due to his compromised immune system and the unforeseen Covid-19 pandemic, to no avail." ECF No 264, at 2. This bald assertion is plainly insufficient. Not only does Cooper fail to prove his assertion, he also does not even allege that the claimed request to the warden was made more than 30 days ago.[1]

As the Third Circuit recently explained, the requirement that a defendant either exhaust administrative appeals or wait 30 days after the warden receives his request before seeking judicial relief is mandatory and must be enforced. *United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (where 30 days have not passed following presentation of a request to a warden, the exhaustion requirement "presents a glaring roadblock foreclosing compassionate release"); *see generally Shaw v. Bank of America Corp.*,

---

[1] Although Cooper bears the burden of proof, undersigned counsel did inquire, and learned from BOP counsel that Cooper submitted a request for either home confinement or compassionate release on March 31, 2020. The request for home detention was denied because he does not meet the criteria for home detention (because his PATTERN risk score is not "minimum," and because of a detainer lodged by the Las Vegas Metropolitan Police Department. *See* Gov't Exh. A (request and denial). The warden has not yet acted on the request for home confinement.

946 F.3d 533, 541 (9th Cir. 2019) ("statutorily-provided exhaustion requirements deprive the court of jurisdiction"); *United States v. Weidenhamer*, No. CR016-01072-001-PHX-ROS, 2019 WL 6050264, at *2 (D. Az. Nov. 8, 2019) (citing cases).

Unless and until Cooper can establish that he requested compassionate release from the warden and that 30 days have elapsed since he made that request, this Court lacks jurisdiction to consider his motion.

**C.     Cooper Has Not Established That Extraordinary and Compelling Reasons Exist to Support His Request for Release.**

*1. Statutory framework*

Once an inmate satisfies the jurisdictional requirements, 18 U.S.C. § 3582(c)(1)(A)(i) permits the district court to "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that (i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

The Sentencing Commission's policy statements are binding on courts. *See Dillon*, 560 U.S. at 827 (where 18 U.S.C. § 3582(c)(2) permits a sentencing reduction based on a retroactive guideline amendment, "if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," the Commission's pertinent policy statements are binding on the court). The Sentencing Commission's pertinent policy statement appears at U.S.S.G. § 1B1.13. The relevant application provides that, so long as a

defendant "is not a danger to the safety of any other person or to the community," "extraordinary and compelling reasons exist under" the following circumstances:

    (A)    Medical Condition of the Defendant.—

        (i)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

        (ii)    The defendant is—

            (I)    suffering from a serious physical or medical condition,
            (II)    suffering from a serious functional or cognitive impairment, or
            (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

    (B)    Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

    (C)    Family Circumstances.—

        (i)    The death or incapacitation of the caregiver of the defendant's minor child or minor children.
        (ii)    The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

    (D)    Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The Court's authority to grant compassionate release is statutorily limited to cases where the "reduction is consistent with applicable policy statements issued by the

Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). Thus the Court should only grant compassionate release where an inmate's circumstances fall into one of the categories listed in USSG § 1B1.13. The "catch-all" provision of "extraordinary and compelling reasons" in USSG § 1B1.13 refers to a determination "by the Director of the Bureau of Prisons" that extraordinary and compelling reasons exist in the defendant's case.

Because the First Step Act, in at least some cases, will allow a court to consider a motion for compassionate release without the benefit of BOP's assessment, the Department's position has been that a court may grant compassionate release not only on grounds specified by the Sentencing Commission, but also those set forth in the relevant BOP regulation governing compassionate release. BOP has issued a regulation defining its own consideration of requests for compassionate release, which are limited to the same bases identified by the Sentencing Commission: medical condition, age, and family circumstances. That regulation appears at Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

The grounds for compassionate release are limited to those listed in app. note 1 to § 1B1.13, and any identified by BOP. *See, e.g., United States v. Saldana*, -- F. App'x --, 2020 WL 1486892 (10th Cir. Mar. 26, 2020) (noting that "neither the § 1B1.13 commentary nor BOP Program Statement 5050.50 identify post-sentencing developments in case law as an 'extraordinary and compelling reason' warranting a sentence reduction," and thus holding compassionate release is not available based on a change in sentencing law).

While an inmate's possible exposure to COVID, standing alone, is not a sufficient ground for compassionate release, COVID-19 may affect whether an inmate can show an "extraordinary and compelling reason" warranting compassionate release under 18 U.S.C.

§ 3582(c)(1)(A)(i)—but only to the extent that (1) the inmate has a condition or characteristic that is a cognizable basis for compassionate release under the current criteria (*e.g.*, a serious medical condition, debilitating condition, elderly offender with medical conditions, etc.) and that condition or characteristic also elevates the inmate's risk of becoming seriously ill from COVID-19, and (2) the inmate is more likely to contract COVID-19 in his or her particular institution than if released.

   2.  *Cooper has not met his burden.*

Cooper asserts that he suffers from asthma, breathing complications, sleep apnea, and an irregular heartbeat, and that his immune system "has been considerably compromised by his ongoing health conditions." ECF No. 264, at 1, 2–5. But he includes *no* medical records—or *any* other evidence—to support these bald assertions. Thus the only confirmed information before the Court regarding Cooper's physical condition is his PSR, prepared in August 2016. In that report, Cooper "characterized his current physical health as 'good,' with no current issues reported," and the report author wrote that "[n]o current medical treatment or prescribed medications were noted." PSR ¶ 83.[2] Cooper's assertions, belied by the only medical information the Court has before it, are plainly insufficient.

Cooper has not demonstrated that he is at high risk to become severely ill from COVID-19, that his risk of contracting COVID-19 while in custody is significantly higher than if he were to be released, or that the facility is unequipped to provide appropriate

---

[2] Again, although Cooper bears the burden of proof, undersigned counsel has been advised by BOP counsel that Cooper's full medical chart from FCI Safford contains no mention whatsoever of Cooper having asthma or an irregular heartbeat, and shows no evidence of any medical condition that would qualify Cooper for compassionate release, or that would make him more susceptible to COVID-19 than the average person.

9

medical treatment if he were to become sick. The speculative possibility of COVID-19 does not present the type of extraordinary and compelling reason to release Cooper early from his sentence.³ We are in the midst of a national crisis requiring extraordinary measures. But § 3582 covers compassionate release, not widespread prophylactic release and modification of lawfully imposed sentences of defendants because of a global pandemic virus.

      3.   *The BOP is best positioned to evaluate and prioritize requests for release.*

We do not underplay concerns about the pandemic. COVID-19 is a nefarious illness that has infected large numbers of people and caused many deaths in a short period of time. BOP has accordingly taken significant measures in an effort to protect the health of the inmates in its charge. BOP began planning for potential coronavirus transmissions in January, when it established a working group to develop policies in consultation with the Centers for Disease Control, including by reviewing guidance from the World Health Organization. On March 13, BOP announced that it was implementing the Coronavirus Phase Two Action Plan to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan's many preventive and mitigation measures include screening all incoming inmates, regularly screening staff; limiting contractor visits to essential services; suspending nearly all in-person attorney, social, and volunteer visits; limiting inmate movements between facilities; and modifying operations to maximize social distancing. BOP has taken further steps as events require, including confining all inmates to their living

---

³ As Cooper seems to acknowledge, there are no confirmed COVID-19 cases at FCI Safford, and indeed there are currently only two confirmed cases in all of Graham County, Arizona. *See* https://bao.arcgis.com/covid-19/jhu/county/04009.html. Nevertheless, Cooper asks this Court to release him to live with his ailing mother in Clark County, Nevada, which, as of April 15, 2020, had 2,509 recorded confirmed COVID-19 cases, with 106 deaths. *See* https://bao.arcgis.com/covid-19/jhu/county/32003.html.

quarters for a 14-day period beginning on April 1, to mitigate any spread of the disease. *See generally* https://www.bop.gov/coronavirus/.

More recently, BOP has been given much broader authority to designate inmates for home confinement. On March 26, the Attorney General directed the BOP Director to prioritize the use of statutory authority to place prisoners in home confinement. The next day, Congress enacted the CARES Act, Section 12003(b)(2) of which authorized BOP, upon the Attorney General's finding that emergency conditions will materially affect the functioning of the Bureau of Prisons, to lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement. On April 3, 2020, the Attorney General gave the BOP Director authority to exercise that discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission. In *less than three weeks*, since March 26, 2020, BOP has placed an additional 1,119 inmates in home confinement. *See* https://www.bop.gov/coronavirus/.[4]

The COVID-19 pandemic presents a serious risk to the health and safety of everyone in this country, including the federal prison population. But excluding BOP from reviewing applications for compassionate release is not the solution. To the contrary, BOP's role is more important than ever to address the extraordinary challenges this unprecedented pandemic has raised. The BOP has been given—and is aggressively exercising—authority to mitigate the COVID-19 risk by designating inmates to home confinement. It is—appropriately—assessing individual inmates' cases and prioritizing those who are most at

---

[4] BOP updates its website regularly with the number of inmates placed in home confinement daily since March 26, 2020. That number was 566 on April 6, increased to 886 on April 9, and to 1,119 on April 16. *See* https://www.bop.gov/coronavirus/.

risk. BOP is in the best position to make both those individual assessments and those prioritization decisions with respect to the inmate population *as a whole*, and is devoting all of its available resources to executing the Attorney General's directive. Diverting BOP resources from that systematic and coordinated effort would be counterproductive.

Moreover, notwithstanding the current pandemic crisis, BOP must carry out its charge to protect the public. It must consider the effect of an inmate's release on the safety and health of both the inmate population and the citizenry (for that reason, BOP is requiring a 14-day quarantine before inmates are released to home confinement to ensure that, if those inmates are asymptomatic carriers of COVID-19, they do not transmit the virus to their family members or the public). BOP must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care. And it must consider myriad other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) that prioritized administrative review therefore makes sense not only in the ordinary case, but *especially* at this perilous time. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with

§ 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2.

Thus, even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Cooper's motion because he has not satisfied the jurisdictional requirements for filing such a motion, and because he has failed to show that extraordinary or compelling reasons warrant relief.

Dated this 16th day of April, 2020

                    NICHOLAS A. TRUTANICH
                    United States Attorney


                    *s / Elizabeth O. White*
                    ELIZABETH O. WHITE
                    Assistant United States Attorney

# CERTIFICATE OF SERVICE

I certify that on April 16, 2020, I electronically filed the foregoing **Government's Response in Opposition to Defendant's "Emergency Motion for Sentence Reduction Pursuant to Title 18 § 3582(c)(1)(A)(i)"** with the Clerk of the Court by using the CM/ECF system.

In addition, I caused a copy of this response to be served on the defendant via U.S. mail at the following address:

>Charles Edward Cooper
>Reg. #49219-048
>FCI Safford
>Federal Correctional Institution
>P.O. Box 9000
>Safford, AZ  85548

Dated: April 16, 2020

>*s / Elizabeth O. White*
>ELIZABETH O. WHITE
>Assistant United States Attorney